**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-095 (RBW)** |
| **v.** | : | |
| | : | |
| **JEFFREY MICHAEL ETTER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jeffrey Etter to 90 days' incarceration, 60 hours of community service, and $500 in restitution.

I.    **Introduction**

Defendant Jeffrey Etter, a 45 year-old real estate investor and agent and veteran of the U.S. Army, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Etter pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 90-days incarceration is appropriate in this case because (1) in three separate instances within minutes of

---

[1] That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

one another, Etter showed a willingness to assault police and had to be held back by another rioter; (2) on two other occasions, he verbally assaulted officers but was not pulled back by other rioters; he continually and loudly berated officers and screamed obscenities, yelling, for example, "you're the aggressors!" "I got you—what's you fucking name!?" "She's ready to fucking hit somebody, go ahead hit me then…you wanna hit somebody!" and disparaging officers as "good Germans"; (3) despite Etter seeing nearby officers directing rioters away from the Capitol building, Etter encouraged the mob to enter the building shouting "inside, hey they said go inside!" (4) about six minutes after his first encounter with police, Etter entered the Capitol through the Senate Wing Doors, as alarms blared, and then spent 37 minutes inside; (5) as he exited the Capitol through a broken window, he paused so a fellow rioter could take a picture of him giving a thumbs up in the window frame; (6) after departing the building, Etter appeared to get chemical irritant in his eyes and saw other rioters assault officers, but instead of leaving the Capitol grounds, he stayed on the Northwest Courtyard until police forced him to leave; (7) after police cleared the Courtyard, Etter lingered just beyond the police lines instead of returning home.

By January 10, 2021, Etter deleted all posts from his Parler[2] account.[3] *See* https://web.archive.org/web/20210110213130/https://parler.com/profile/jeffEtter (accessed June 13, 2023). As outlined below, Etter's deleting his posts reveals his consciousness of guilt.

---

[2] "'Parler, founded in 2018, bills itself as 'unbiased social media' and a place where people can 'speak freely and express yourself openly without fear of being 'deplatformed' for your views,' according to its website and App Store description." *See* https://www.cnn.com/2021/01/10/tech/what-is-parler/index.html (accessed June 13, 2023). Parler was taken offline in April 2023. *See* https://mashable.com/article/parler-acquired-shut-down (accessed June 13, 2023).

[3] The government was able to recover Etter's cached Parler posts as they appeared on Etter's Parler account on November 23, 2020 and December 1, 2020. The government was not able to recover posts between December 1, 2020 and January 10, 2021.

The Court must also consider that Etter's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Etter's crime support a sentence of 90 days incarceration, 60 hours of community service, and $500 in restitution.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), at ¶¶ 1-7.

### Etter's Role in the January 6, 2021 Attack on the Capitol

After the November 2020 presidential election, Etter began posting to his Parler account, stating his belief that the election was stolen  On about November 9, 2020[4], he "Echoed"[5] a post stating  "ECHO  If  you  think  Donald  Trump  WON  the  election!"  *See* https://web.archive.org/web/20201123160446/https://parler.com/profile/jeffETTER/posts  (scroll to bottom to view post).  On about November 17, 2020, he "Echoed" a video from the Proud Boys[6] titled "PROUD  BOYS  HAVE  BEEN  HERE  SINCE  DAY  ONE  AND  WE'RE  NOT  GOING ANYWHERE" and that stated that the election was "contested." *Id*. (scroll to two thirds down the

---

[4] The archived webpage does not state the actual date of the posting, but the webpage shows what Etter's account looked like on November 23, 2020 and next to the post, it states "2 weeks ago." For this reason, the government approximates that Etter posted the content on November 9, 2020.  The government made similar approximations regarding posting dates for Parler throughout this paragraph.

[5] In Parler, an "Echo" is simply a repost of another's posting.  It is equivalent to a retweet in Twitter parlance.  *See* https://www.distractify.com/p/what-does-echo-mean-on-parler (accessed on June 13, 2020).

[6] From the evidence gathered in this case, it does not appear that Etter is or was a Proud Boy.

webpage to view post). At around the same time, he "Echoed" another post from the Proud Boys, with a photoshopped image of Donald Trump as a gladiator and a caption of "FOUR MORE YEARS." *Id*. (scroll two thirds down the webpage to view post).  Similar posts regarding alleged election fraud continued. *Id*; *see also* https://web.archive.org/web/20201201191957/https://parler.com/profile/jeffEtter (accessed June 13, 2023). These posts include, for example, a link to a story with the headline, "CONFIRMED: Georgia Was Stolen" from approximately November 24, 2020. *See* https://web.archive.org/web/20201201191957/https://parler.com/profile/jeffEtter (accessed June 13, 2023) (scroll halfway down webpage to view post).  By January 10, 2021, Etter had deleted his posts on Parler. *See* https://web.archive.org/web/20210110213130/https://parler.com/profile/jeffetter (Etter's Parler account as it appeared on January 10, 2021, showing all posts had been deleted). The government therefore only has access to Etter's posts from December 1, 2020 and a few weeks prior. Given video footage showing Etter frequently using his mobile telephone  on January 6, 2021; Etter used Parler frequently; and other rioters posted videos on Parler showing their criminal conduct on January 6;[7] Etter's deletion of his posts evidences his consciousness of guilt.

On January 6, 2021, Etter traveled to Washington, D.C.  and attended the "Stop the Steal" rally in support of the former President. After Trump's speech at the rally, Etter made his way to the U.S. Capitol and eventually walked to the Capitol's Northwest Courtyard. Etter wore a white, red, and blue cap, gray and red shoes, a black sweatshirt, and tan pants.  He helped carry a large American Flag to the Capitol as he smiled and stood at the forefront of the flag carriers.

---

[7] *See, e.g.,* https://projects.propublica.org/parler-capitol-videos/ (accessed June 13, 2023).



Image 1: Etter walking to the Capitol.

By 2:49 p.m., Etter had arrived at the Northwest Courtyard of the Capitol. Etter was standing on a ledge next to a window when police officers approached him and attempted to remove him and other rioters from the Northwest Courtyard.  At 2:50 p.m. he jumped down from the ledge.  *See* Exhibit 1A.  Immediately and without provocation, he verbally assaulted an officer. Here is a summary of what the video, Exhibit 1A[8], shows:

- 0:05-Etter visible on the ledge.

- 0:14-Etter confronts an officer shouting, "Chill the fuck out!" This is the start of Etter's **first confrontation with police**.

---

[8] For Exhibits 1-7, the Government has provided annotated video clips and unannotated versions of the clips to the Court and opposing counsel. Exhibit 1 is unannotated and Exhibit 1A is the annotated version. The same is true for Exhibit 2 and Exhibit 2A and so forth. The differences between the different exhibits is further explained in the Government's Exhibit Notice.



Image 2: The start of Etter's **first confrontation with police**. Screenshot from Exhibit 1A at 0:16.

- 0:17-Officer prepares to spray Etter with what appears to be chemical spray if Etter decides to attack.



Image 3: Officer prepares to protect his fellow officer from Etter. Screenshot from Exhibit 1A at 0:17.

- 0:18-0:22-Etter shouts at an officer, "That fucker right there! Hey guy, calm the fuck down!"



Image 4: Etter shouting "That fucker right there! Hey guy, calm the fuck down!" Screenshot from Exhibit 1A at 0:19.

- 0:22-Another rioter pulls Etter back.

- 0:39-Despite briefly turning as if to walk away, Etter reengages with police. This is Etter's **second confrontation with police.**

- 0:45-0:59-Etter shouts, among other epithets and obscenities, "You, you should be ashamed of yourself!" and "I got you—what's you fucking name!?" all as the same fellow rioter attempts to separate him from the officers.



Image 5: Etter's **second confrontation with police**, occurring within seconds of the first confrontation. Note the other rioter continuing to attempt to pull Etter away. Etter chose to menace officers despite having an opportunity to walk away. Screenshot from Exhibit 1A at 0:51.

- 1:05-1:15-A rioter asks police "Which way do you want us to go?" After the officer in the video is clearly shown gesturing away from the Capitol Building, Etter misrepresents the officer's response and shouts "Inside! Hey, they said go inside!"

- 1:34-1:45-Rather than leave the Capitol, Etter chooses to stay on the Northwest Courtyard and shouts at the officers "Right here, these are the good Germans! These are the good Germans!"

- 1:54-2:20-Etter chooses to move threateningly toward the police line. This is his **third police confrontation in a matter of minutes.** At this point, he screams "She's ready to fuckin hit somebody, go ahead hit me then… you wanna hit somebody!" before he is pulled back yet again by another rioter. As this occurs, the mob shouts "Police stand down!"



Image 6: Etter's **third confrontation with police**, occurring within minutes of the first two confrontations. Another rioter is holding Etter by his backpack as Etter menaces and verbally assaults officers. Screenshot from Exhibit 1A at 2:00.

At approximately 2:55 p.m., about three minutes after Etter saw an officer explicitly tell him to move *away from the building*, Etter unlawfully entered the Capitol through the Senate Wing Door, the glass of which was broken.  An alarm blared.  Etter chanted "Traitor! Traitor! Traitor!" in unison with other members of the mob as he entered the building with his phone held high. *See* Exhibit 2A, 0:08-0:15.



Image 7: Etter entering the Capitol building through the Senate Wing Doors.  Screenshot from Exhibit 2A at 0:11.

Etter began to walk through the Capitol's first floor, entering the Capitol Crypt and House Wing Door areas.  Etter eventually returned to the area of the Senate Wing Door and exited the Capitol through a broken window at approximately 3:32 p.m. As he left, he posed for a photo, giving what appears to be a thumbs up, and then returned to the Northwest Courtyard. *See* Exhibit 3A, 0:09-0:17.



Image 8: Etter posing with a thumbs up in the broken window as he exits the Capitol Building. Screenshot from Exhibit 3A at 0:10.

In total, Etter spent approximately 37 minutes inside the Capitol building.

After leaving the Capitol building, Etter apparently was hit with a chemical irritant in his eyes.[9] Rather than leaving the Capitol grounds to obtain treatment, Etter stayed in the Northwest Courtyard as riot police gathered and another rioter poured water into Etter's eyes.

Etter then verbally assaulted police for the *fourth* time. He shouted, "you're fucking aggressors! Hurting good people [the rioters]!" *See* Exhibit 4A, 0:00-0:17. At around this time, the air was thick with what appeared to be tear gas. As Etter was screaming at police, an injured rioter sat a few feet away. Nonetheless, he still chose to remain in the Northwest Courtyard.

---

[9] The government has not been unable to discover how the irritant got into Etter's eyes.



Image 9: Etter's **fourth** verbal assault of officers, standing next to an injured rioter. Tear gas or some form of chemical spray appears to be in the air. Screenshot from Exhibit 4A at 0:08.

After unleashing that fourth assault, Etter watched as other rioters physically assault police. *See* Exhibit 5A, 0:00-0:31. Again, the air was thick with chemical spray/gas. Nevertheless, Etter did not leave until police physically forced him to leave.



Image 10: Etter watched as rioters assaulted police. Despite witnessing the attack, Etter remained on the scene. Screenshot from Exhibit 5A at 0:12.

At approximately 4:31 p.m., officers began directing the mob away from the Capitol. Etter then verbally assaulted officers for the fifth time. He shouted, "You're good Germans, and I hope you sleep well tonight!" *See* Exhibit 6A, 0:00-0:12. He then shouted, "what the fuck is wrong with you?!" twice, "you like this?", and "we can't even fuckin' move!… shameful, shameful." *Id.* at 0:20-0:51. As he did so, he approached an officer in a menacing manner, standing mere feet away. *Id.* at 0:37. Shortly thereafter, he shouted, "you are the aggressors!" three times. *Id.* at 1:16-1:25.



Image 11: Etter's **_fifth_** verbal assault of officers.  Screenshot from Exhibit 6A at 0:37.

After the police cleared the Northwest Courtyard, Etter stayed just beyond the police line instead of leaving the Capitol grounds. While there, Etter took a photo of another rioter smiling and posing just in front of the police line. *See* Exhibit 7A, 0:00-0:19.



Image 12: Etter taking a photo of another rioter.  Screenshot from Exhibit 7A at 0:12.

*Etter's Interview*

On June 27, 2023, Etter gave an interview to the FBI pursuant to the plea agreement. ECF 21, Plea Agreement, Section X. Etter claimed he was sorry that he chose to go the Capitol on January 6. But he also claimed he did not remember most of what he did before, during, and after January 6,  and minimized the conduct he did recall.  Etter 's convenient inability to recall his actions on January 6 reveals a lack of candor and a lack of true remorse.

During the interview, Etter suggested police allowed rioters into the Capitol Building. After being pressed, however, Etter admitted the police were simply overwhelmed and could not stop the rioters' breach of the Building. Etter also eventually admitted that he knew he should not have entered the Capitol and specifically recollected the blaring alarms and broken glass when he broke into the Building. He claimed to not know why he stayed in the Building or on Capitol Grounds

as long as he did. Etter commented that it was strange that some rioters were wearing gas masks and vests.

Etter unbelievably claimed only to remember one negative interaction with police. In that interaction he admitted that he said, "What the F? We can't move." The only other interaction with police he recalled was a conversation with a police officer where Etter joked "I was told if I come to the Capitol today, I would get a free tour." Etter allegedly made this "joke" at the same time that rioters viciously beat officers in other areas of the Building and Grounds in order to get the "free tour" of which Etter spoke. Furthermore, the relevant video footage does not show a calm discussion between Etter and police. Given the number and intensity of his verbal assaults on police, his alleged failure to remember his verbal assaults rings untruthful. Etter, however, does not deny that the more aggressive encounters shown on video occurred.

Etter also claimed an inability to recall how he got chemical irritant in his eyes. He could not say whether the irritant was in the air or if an officer needed to spray him.[10]

Etter admitted that he took photos and videos on his phone and deleted them after January 6. He claimed he did this because he did not want his children to see the videos and photos on his phone. This motivation begs the question: what was Etter trying to hide from his children? Accordingly, Etter apparently deleted evidence of his January 6 conduct in order to obstruct any criminal investigation rather than to protect his children. [11]

---

[10] The videos reviewed in this matter show Etter after he has irritant in his eye. They do not show how the irritant got in his eyes,

[11] Etter also admitted he saved some video of him in the Capitol Building on his computer and shared it with his counsel. After the interview, Etter's counsel exchanged two video clips with the government. That video shows neither aggravating nor mitigating conduct.

Etter further claimed to have no memory of using Parler or deleting his Parler posts after January 6. Given the frequency with which he posted prior to January 6 and that the posts were all gone by January 10, 2021, these assertions are highly dubious. It stands to reason that Etter deleted his posts because he wanted to be rid of evidence of his crimes. Etter's remorse carries little weight because he claimed not to remember most of his conduct and he minimized his illegal entry to the Capitol Building.

*The Charges and Plea Agreement*

On February 22, 2023, the United States charged Etter by criminal complaint with violating 18 U.S.C. § 1752(a)(1) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds , 40 U.S.C. § 5104(e)(2)(D) - Disorderly Conduct in a Capital Building, and 40 U.S.C. § 5104(e)(2)(G) - Parading, Demonstrating, or Picketing in a Capital Building. At approximately 8:00 a.m., Etter surrendered himself to the FBI on February 24, 2023. On March 23, 2023, the United States charged Etter by a four-count Information with violating the same four offenses.  On May 15, 2023, pursuant to a plea agreement, Etter pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Etter agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Etter now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Etter faces up to six months of imprisonment and a fine of up to $5,000. Etter must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C.

Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of to 90 days incarceration, 60 hours of community service, and $500 in restitution.

One of the most important factors in Etter's case is his eagerness to menace police. His contempt for the police was so strong that, as he screamed at officers, he had to be held back by another rioter on three occasions in order to avoid a physical confrontation with the police. On another two occasions, he verbally assaulted officers with venomous obscenities and epithets.

Etter lied and exhorted the mob to enter the Capitol building by shouting "they [the police] said go inside!" This lie directly contradicted officers' orders for rioters to move away from the building, orders that Etter had witnessed moments before broadcasting his lie. This conduct further endangered the lawful inhabitants of the Capitol building and the police trying to protect it.  Etter also defied the orders himself.

Etter's calling officers "good Germans" three times, in addition to the other pejoratives he screamed, is particularly aggravating.  By calling them "good Germans," he mocked their heroic service on January 6. Earlier this year, Metropolitan Police Officer Christopher Owens wrote a letter to Judge Mehta about the physical and verbal attacks he endured on January 6, 2021. Officer Christopher Owns wrote that "physical traumas, bruises and scars have healed but the emotional and mental traumas from that day stay with me to this day." *See* Victim Impact Statement from *United States v. Rhodes, et al.*, 22-cr-15 (APM), attached here as Exhibit 8 at 1.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### A.  The History and Characteristics of Etter

As set forth in the PSR, Etter's criminal history consists of several traffic offenses. ECF 26 ¶¶ 34-36. Etter reported to the PSR writer that he enlisted in the U.S. Army in 1995 and was honorably discharged in 2011. As noted above, Etter owned a gym in Portsmouth, Virginia until October 2022. He currently works as a realtor and real estate investor. Etter has been compliant with his conditions of pre-trial release.

While Etter's military service is laudable, it renders his conduct on January 6 all the more troubling. As a veteran, Etter was well aware that that people cannot simply enter restricted government buildings. His voluntary decision to storm a guarded government building is nothing short of shocking in light of his former military service and training. In this case, Etter's conduct and former military service demonstrates a very real need for specific deterrence in the form of incarceration.

Etter's Presentence Report mentions that Etter experienced difficulties due to the loss of a job in April of 2020. Etter found new employment in March of 2021.  Etter's gym was still open during the period of unemployment, though it is uncertain if Etter worked for the gym.

 The Report also mentions some mental health issues that came to a head at around the time of January 6.  The Report states that Etter believed some medication that Etter was taking to help with these issues made him a different person.  He reported that he stopped taking his medication in January 2021.

To the extent Etter argues that these circumstances are mitigating, the Court should disregard that argument.  While the government sympathizes with any person undergoing a difficult period, there is no indication that Etter's circumstances somehow explain, justify, or are in any way related to his rioting on January 6.  The circumstances certainly did not spur Etter to verbally assault police.

**B.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**C.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. As this Court has said,

> I think the reality is that there has to be a message sent. There has to be punishment. People have to understand that if you are not going to accept electoral results that are supported by the courts and supported by all of the research that has been done that looked into it and

you cause yourself to become involved in the mob mentality that resulted on January 6, that you are going to have to pay a price. Maybe, maybe, the next time around when people are unhappy with the result, maybe they will think and they will say, well, even though I don't like the result and even though I don't agree with the result, I am not going to do what happened back on January 6 of '21. Because if I do, I am going to get punished.

*United States v. Llloyd Casimro Cruz, Jr.,* 22-cr-64-RBW, Tr. at 30 (statement of Judge Walton). Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.

According to Rachel Kleinfeld, a senior fellow in the Democracy, Conflict and Governance Program at the Carnegie Endowment for International Peace, one of the reasons President Trump's indictments have not led to additional violence is that the prosecutions of January 6 rioters have "'had a real deterrent effect.'" https://www.nytimes.com/2023/06/15/us/politics/trump-protests-proud-boys.html (accessed June 16, 2023). Therefore, the Court should continue to hand down sentences that will deter future would-be rioters.

*Specific Deterrence*

On January 6, Etter took matters into his own hands. He verbally assaulted officers and showed a willingness to physically attack them. He stayed in or just outside of the Capitol building until police forced him out, at which point he stayed just beyond police lines rather than returning to his home. For these reasons, the Court should provide a sentence that will deter Etter from vigilante conduct in the future.

**D.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[12] This Court must sentence Etter based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Etter has pleaded guilty to Count Four of the Information, charging him with willfully and knowingly parading, demonstrating, and picketing in any United States Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71

(ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons.

This Court has previously recognized the significance of verbally abusing police. In *United States v. Jeffrey Smith,* 21-cr-290 (RBW), the court specifically noted in handing down a sentence of 90 days incarceration that the defendant was in "close proximity to the police, and it should have been obvious that they were under tremendous duress by what was occurring, [but] you [the defendant] told the police officers to stand down and you also told them that you were going get your way as far as entering where they were trying to prohibit entry one way or another." Tr. At 19 (statement of Judge Walton).

*Jeffrey Smith* is highly analogous to this matter because Etter, like Smith, was a veteran with no prior record before January 6 who pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G). *Id*. In noting Smith's military experience, the Court said, "It's hard for me to appreciate how someone … who has served in the military would have the mentality that Mr. Smith engaged in on that day." *Id*. at 18. Etter, like Smith, entered the Capitol, despite knowing police were trying to prevent the mob from going into the building. *Id*. at 16. Etter, like Smith, contributed to overrunning the Capitol, even though he did not physically assault police. *Id.* at

17. Etter, like Smith, took actions to egg on the mob and ease its path. *Id*. at 17-18 (Smith removing benches placed by police as compared to Etter's encouraging the mob to go inside the building in spite of police orders to move away from the building). Etter, like Smith, was proud of his actions on January 6. *Id*. at 18. (Smith fist pumped while Etter posed for a photo with a thumbs up.) Smith, like Etter, was mostly unremorseful. *See* ECF 36, Government Sentencing Memorandum, at 23-24, *United States v. Jeffrey Smith,* 21-cr-290 (RBW). Both Smith and Etter have shown that they had some general sense of remorse but little remorse for their specific conduct on January 6, 2021. *Id*.

    In some respects, Etter's conduct was worse than Smith's. There is no indication that Smith menaced officers on five occasions, and, on three of those occasions, had to be held back by other rioters. There is also no indication that an officer had to draw and point chemical spray at Smith. There is no indication that Smith threatened officers, as Etter did, by saying, "I got you—what's you fucking name!?" or "She's ready to fucking hit somebody, go ahead hit me then…you wanna hit somebody!"  For these reasons, a sentence of at least 90-days in prison, 60 hours of community service, and $500 in restitution is appropriate for Etter.

    Similarly, in the *United States v. Brent Holdridge*, 21-cr-729 (RBW), Holdridge pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  Holdridge, like Etter, entered the Capitol despite knowing it was off limits.  Also, while in the building for 10 minutes, Holdridge posed for a photograph in the Parliamentarians' Office as other rioters ransacked that office. This Court sentenced Holdridge to 60 days in prison, three years of probation, and $500 in restitution. Holdridge did not menace or threaten officers, as Etter did, and Holdridge was in the Capitol building for less than one-third of the time Etter was inside.  As such, Etter should be sentenced to a 90-days in prison as opposed to Holdridge's 60 days.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[13] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[13] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Etter must pay $500 in restitution, which reflects in part the role Etter played in the riot on January 6.[14] Plea Agreement at Section XI. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20"[15] in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Etter's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 117.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 90 days incarceration, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES

---

[14] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[15] The estimated damages has since increased to more than $2.9 million.

United States Attorney
D.C. Bar No. 481052

By:    <u>/s/ *Joshua Ontell*</u>
Joshua Ontell, VA Bar No. 92444
Assistant United States Attorney – Civil Division
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C.  20530
(202) 252-7706
joshua.ontell@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 7th day of  September 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Joshua Ontell*
Joshua Ontell, VA Bar No. 92444
Assistant United States Attorney – Civil Division
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C.  20530
(202) 252-7706
joshua.ontell@usdoj.gov