THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 1:23CR95 |
| | ) The Hon. Reggie B. Walton |
| JEFFREY MICHAEL ETTER, | ) |
| | ) Sentencing Date: September 11, 2023 |
| Defendant. | ) |

## DEFENDANT'S POSITION ON SENTENCING

COMES NOW, the Defendant, Jeffrey Michael Etter ("Mr. Etter") by and through counsel, and pursuant to Rule 32 of the Federal Rules of Criminal Procedure and this Court's policies and procedures regarding sentencing, states that he has received and reviewed a copy of the Presentence Investigation Report ("PSR") filed in this case with counsel, and has noted only one scrivener's error as per his Notice of Correction (Dkt. 29). In consideration of same, as well as of 18 U.S.C. §3553(a) ("3553") and applicable case law, Mr. Etter respectfully presents his Position on Sentencing as set forth below:

## BACKGROUND

January 6, 2021, was, for Jeffrey Etter, the culmination of approximately eighteen months of significant struggles with his mental health. The issues, long dormant but bubbling to the surface, dated back to age thirteen and his yet-to-be adequately addressed childhood trauma, but they were exacerbated by the loss of his job, the closure of his gym (which provided an outlet for him *and* a means for him to help other veterans struggling with service-related issues), the isolation caused by the COVID-19 pandemic, and the relentless onslaught of social media and even so-called "legitimate" news outlets claiming election fraud and that COVID-19 was a hoax. It was sometime in or around October 2019, when Mr. Etter first appeared to take a downturn in

his mental health, which his wife suspects was triggered by his nephew shooting off a BB gun. PSR at 12. It was then that Mr. Etter finally opened up to her about the tragic events that occurred when he was thirteen and accidentally shot, and almost killed, his best friend. *Id.* After revealing his struggle to his wife, Mr. Etter sought therapy and was doing well. . . and then COVID shut it down. *Id.*

While he couldn't continue with his own therapy, Mr. Etter invested approximately $50,000.00 of his own money into a Cross-Fit Gym that served as a tight-knit community and outlet for him and other veterans suffering from post-traumatic stress disorder and other issues, many related to their service. *See* Exhibit I; PSR at 17. Mr. Etter is credited by one member as having "changed his life" during that time. Exhibit D. And then, COVID shut it down. According to Mr. Etter's wife, members began texting that they would take their own lives if they couldn't come to the gym, and for a time, Mr. Etter defied the order to shut down the gym, but ultimately relented. *See* PSR at 12.

The downward spiral in Mr. Etter's mental health led to the loss of his job, and with the loss of the gym and the feeling that he was failing the veterans who had come to rely on him, things became very dark in the Etter household. *Id.* The medication Mr. Etter was on didn't help, and Mr. Etter attests that he became a different person—using marijuana, getting tattoos, spending time on the internet. *See* PSR at 13.

Prior to January 6, 2021, Mr. Etter hadn't ever attended a political rally. PSR at 7. He wasn't a member of any radical group or any group with a political leaning or affiliation. As he puts it, he had never even put out a yard sign. *Id.* He had served honorably and with distinction as a member of the revered 82nd Airborne. *See* Exhibits N & O. But then he went to Washington, D.C. and committed the offense that brings him before the Court, which he has relived again and

2

again since, wishing more than anything he had never left the house that day. The government is incorrect in its presumption that because Mr. Etter has trouble recalling some details that he lacks remorse or minimizes his behavior. In fact, "remorseful" doesn't begin to describe the shame, embarrassment, and regret that Mr. Etter feels about January 6, on which he will expound in his allocution before this court at sentencing.

## APPLICABLE LAW ON SENTENCING

The Court is mandated to exercise discretion in the imposition of a sentence that is "sufficient, but not greater than necessary" to achieve the enumerated objectives of criminal sentencing, and this exercise must include a consideration of each of the factors laid out in 3553. *See Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Nelson v. United States*, 555 U.S. 350 (2009).

## POSITION ON APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

I. *The Nature and Circumstances of the Offense*

While January 6 was for Mr. Etter the culmination of his own struggles, it was for this country the horrible climax of years of dysfunction, division stoked by misinformation, and the debasement of our democracy, marked at various times by so-called "demonstrations" and "rallies" planned in the echo chambers of social media, and taken to our streets—where destruction and violence, instead of a peaceful expression of dissent, were the *agenda*, not just the byproduct. But that is *not* what Mr. Etter came to D.C. for, that is not what he represents as a man, and it is not something he would have been associated with at any other time in his life. The totality of the circumstances of Mr. Etter's offense—those occurring in his own life in combination with those occurring nationwide—were unprecedented and god-willing never to reoccur.

The law regards offenses of this classification as "petty." That word has various definitions, all of which are applicable, but it is not lost on Mr. Etter that the collective effect of the thousands of "petty" acts committed by the majority of people descending upon the capitol, was devastating. And of course, the video clips submitted by the government remind us of precisely that, and it is effective and jarring. The video that the government submits of Mr. Etter's time outside and inside of the capitol building is hard to watch—for Mr. Etter as much or more than for the court and counsel, because for him it bring shame. And it is based on those moments that the government paints Mr. Etter with the broad brush as "J6 Defendant" rather than as "Jeffrey Michael Etter, J6 Defendant." Mr. Etter prays only that the court not so readily the government's position that every single word and action of Mr. Etter from Election Day 2020 to date—including his actions on January 6th—be viewed automatically and solely in the most damning light, and offers the following in response to the three most significant points in the government's position paper with respect to his offense conduct.

Seeing the crowd pushing into the building, the officers helpless to do anything but try to get people *through* because they could not keep them *out*, is angering. And Mr. Etter, like many others, was absolutely raising his voice and even using profanity, including when speaking to officers. However, it must be pointed out that although he is yelling at and at times as noted insulting officers, it is incorrect to characterize his actions as "assault." Federal courts apply the common law definition to simple assault as a specific intent crime requiring in part, "an intentional attempt or threat to inflict injury upon someone else." *See, e.g., United States v. Cua*, ____ F.Supp.3d.____, 2023 WL2162719 (D.D.C. 2023). Mr. Etter was wrong. He behaved in a manner unbecoming of someone claiming to be a patriot, let alone of a servicemember. His words were poorly chosen, inappropriate, and a host of other negative adjectives, but they did not constitute assault.

On (at least) two of the four instances of verbal engagement with officers cited by the government, Mr. Etter was *reacting* to the situation getting too physical, including after an older man was pushed down. Reacting well? No. But even in those worst moments, driven by adrenaline and his own demons, that is all he did was *yell* and he didn't yell threats. At no time did he touch a law enforcement officer. At no time did he raise his hands to a law enforcement officer. At no time was he, as the government unfairly and inaccurately characterizes, "about to attack" anyone. How do we know this? Because despite being in the building for just over 30 minutes, and on the grounds for an even longer time, he never "attacked" anyone or anything, even after being sprayed with a chemical irritant—the source of which remains unknown. The idea that he was somehow on the verge of violence before entering the building, and then over the course of an hour which included him being sprayed with irritant he somehow *decompressed* begs credulity, and it's simply not true. He was never going to commit violence against anyone.

The government also mischaracterizes Mr. Etter's encouragement of the group to go into the building as "a lie." It was not a lie. The video does not show everything that was happening, and more importantly it does not put us in Mr. Etter's shoes, interpreting in the moment everything he saw or heard. He saw what he believed was an officer waving people in—since they could not go back due to the pushing crowd—and yelled, "They're *telling us* to go in." While Mr. Etter acknowledges that he was not authorized to be at the U.S. Capitol and that an officer "letting" the mob in would only have been doing so for lack of options given the size and momentum of the mob, there is a very significant distinction between someone saying, "Go ahead, they're saying it's ok," as opposed to "Let's go!! Push your way in!" or "It's our house!" And at one point as Mr. Etter made his way through the crypt, he did appear to be "escorted" as officers, with their backs to him and

5

crowd, walked in front—at a normal distance—and at times pointed to the way the crowd should exit.

Counsel must make one thing clear. The government highlights moments as aggravating circumstances, and counsel must therefore respond and correct, because the court has to consider the nature and circumstances of the offense. And so, the delicate and precarious offering of "explanation but by no means excuse" is unavoidable. However, Mr. Etter doesn't watch these videos and make excuses. He watches them and becomes visibly shaken and upset. He did, in fact, block a lot of the day out, because he's miserable thinking about it. He is angry *with himself*, and the videos are indelible moments he absolutely wishes he could forget because they comprise his commission an offense against the country he swore to protect "against all enemies foreign and domestic."

Finally, the government twice points to Mr. Etter's deletion of Parler posts after Jan 6 as "consciousness of guilt." First off, this is another unfair stretch. What remains on Mr. Etter Parler account are posts clearly indicating dissatisfaction with the election and acceptance of the misguided and inexplicably widespread belief that Donald Trump won the election. Why would he leave *these* (or any) posts there if trying to distance himself from January 6 in some nefarious manner, as the government suggests? We simply don't know what was deleted and why, but again attributing the worst possible interpretation to his actions is unfounded. Second, if he had posted again after January 6, or even left up posts of that day on his page, the government would no doubt cite to his *not* deleting it as proof of lack of remorse. He'd be damned either way if one assumes the worst of his every act or omission. Third and most importantly, we are not at trial. Mr. Etter's "consciousness of guilt" is not in question and is not something that the government should be able to cite as an *aggravating factor* as if Mr. Etter has plead not guilty. Mr. Etter has *admitted his guilt*. He's *always*

6

*been conscious of it*. He agreed to plead as soon as possible after being charged and retaining counsel.

    II.    *History and Characteristics of the Defendant*

Jeffrey Etter is a 45-year-old husband, and father of three who was born and raised in Gorham, New Hampshire. He enlisted in the United States Army out of high school and served with the 82nd Airborne Division as a paratrooper, obtaining an honorable discharge at the rank of Sergeant (E5). Thereafter, Mr. Etter attended and graduated *cum laude* from Amherst College of the University of Massachusetts, achieving his Bachelor of Arts degree in two years. He then proceeded to enjoy a very successful career in medical device sales which lasted up until April 2020.

But Mr. Etter, despite all outward appearances of "having it all together," had never processed or dealt with the enormous guilt he felt for accidentally shooting his friend at the age of thirteen. Although his friend did not die, he was unable to follow his own dream of serving in the military and ultimately, spiraled into substance abuse. Mr. Etter lost touch with him, but it doesn't require a degree in psychology to determine that Mr. Etter's drive and ambition—which it served him very well for some time—came at a cost to his own mental and emotional health. If he just kept going, not only could he put is aside, but he could succeed for *both* him and his friend, doing all the things they both had talked about. And for a while, he could do just that. That is, until one event brought it back. Right before the world shut down and the Etters lived a year that his wife describes as "Hell on Earth," when "life was bad," from March 2020 through March 2021.

But *since* he came out of this dark period in his life, Mr. Etter has turned things back around. The events of January 6 were a wake-up call, and he removed himself from social media, came off the medications he believes were changing his personality, and turned to religion, faith, and family to

7

once again embrace the blessings in his life. He still suffers from some anxiety, and much of it related to the events of January 6 and the consequences he has and will face.

Mr. Etter is resolved not only to make up for what he's done to this court, but to his family. His daughter especially, a high schooler as all of this has transpired, was mortified. For that, Mr. Etter is also deeply sorry and ashamed. He wants never to cause his children, wife or parents pain, worry, embarrassment or anxiety ever again.

*III.  The Need for Adequate Deterrence and To Promote Respect for the Law*

Aside from this case, Mr. Etter has never been in trouble beyond a traffic ticket. He wasn't driven or compelled to offend on that day when he did in fact break the law, and he is not driven or compelled to re-offend. A period of probation will allow the court to witness Mr. Etter making good on his promise to himself, his family, and this court. A period of incarceration would be "greater than necessary" to punish what is under the law still a minor offense as well as to deter an otherwise law-abiding, decorated veteran and family man.

As for general deterrence, studies have shown that longer/harsher sentences are *not* a greater deterrent to criminal behavior.  *See* Wright, Valerie. "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment," (Nov. 2010). For those in society for whom it matters (i.e., those who would be deterred) *the possibility of punishment itself is deterrence*. The Institute of Criminology at Cambridge University found in 1999 that there was no evidence to support the notion that increased sentences resulted in greater deterrence but that there was evidence, from studies of offense rates in particular populations, that the greater the likelihood (or probability) of punishment, the lower the crime rate. *See id.* at 4 *citing* Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P.O. Wikstrom, "*Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*," Oxford: Hart Publishing, 1999.

In other words, people who can be deterred are deterred by the idea of punishment itself. Leading scholars on the subject, Daniel Nagin and Greg Pogarsky, reached a similar conclusion: that "punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences." Wright at 4 *citing* Daniel Nagin and Greg Pogarsky. "*Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*," Criminology, 39(4), 2001. It is safe to say that the message is being broadcast nationwide and beyond to those who might be inclined to offend in this fashion, to wit: that prosecution and punishment are indeed a virtual certainty, *no matter who you are*.

    IV.     The Kind of Sentences Available & Avoiding Disparity

Mr. Etter was charged on or about February 28, 2023, and by the first week of April was finalizing his plea paperwork. As part of his Plea Agreement, Mr. Etter agreed to cooperate with further investigation (Dkt. 21, page 2, para. III)—something that not all January 6 plea agreements include—and he followed through with a debriefing and consented to a search of his phone and social media accounts. Had he been one of the "first wave" of defendants charged, he'd have been the beneficiary of the United States Attorney's Office abandoned policy of recommending probation for "fast track" cases (individuals who pleaded guilty to misdemeanor charges within a short period of time, thereby saving resources, just as Mr. Etter has done). Truly, no policy that is applied to *everyone* should significantly inform the court's 18 U.S.C. § 3553 analysis, because it eliminates the requisite consideration of the individual defendant. But the government's *new* policy—to recommend probation for *no one*, despite the earlier "fast track" recommendations—is more troubling by half. The government's new policy can be summed up thusly: What we once recommended was the appropriate sentence for everyone

9

similarly situated to Mr. Etter, we now submit is not appropriate for anyone, at all. They are recommending jail for everyone similarly situated to those for whom no jail was recommended, as a matter of course, only last year. A recommendation driven even in part by "police" lacks certain credibility, since it's founded in large measure on "what we're doing with these cases," not 3553, which asks "what's the right sentence for this defendant." Mr. Etter submits that this alone warrants some discounting of the government's recommendation, but regardless, when considered fully, the 3553 factors inform a probationary sentence.

This court has sentenced defendants with similar offense conduct to probation. Notable examples are: *United States v. Anthony Marriotto*, 21cr94-RBW – 36 months' probation, 250 hours' community service, and a $5000.00 fine. Mr. Marriotto's offense conduct included entering the Senate chamber, glorifying the assault on police, and afterward, speaking to a local news station denying the allegations against him as "fake news;" *United States v. Vinson*, 1:21cr355-RBW – 60 months' probation, 120 hours' community service, and a $5000.00 fine. Both Lori Vinson and her husband received the same sentence, but Mrs. Vinson notably spoke to the media after the riot and indicated she had no regrets and "would do it again tomorrow;" *United States v. Joseph Zlab*, 1:21cr389-RBW – 36 months' probation, 200 hours' community service, and a $500 fine, Mr. Zlab's conduct. Like Mr. Etter, Mr. Zlab did not boast on the news or social media, did not break anything, enter any offices, or hurt anyone. He didn't call for harm to befall officers or elected officials. He didn't come armed with any kind of weapon or protective gear indicating an intent to engage in violence. Mr. Zlab's conduct differed from Mr. Etter's in that he was only inside the capitol for a approximately thirteen (13) minutes, and was not observed raising his voice or engaging with any officers. On the spectrum of these similarly

charged Defendants sentenced by the court, Mr. Etter's conduct falls somewhere between Mr. Zlab's and the others who received sentences of probation.

The court has been presented two very different proposed solutions by the parties. A sentence of probation provides the court continued confirmation, for a lengthy period of time, of Mr. Etter's true nature and resolve. A sentence of probation requires that Mr. Etter continuously acknowledge and reflect upon, for a lengthy period of time, his wrongdoing. A sentence of probation holds him accountable to this court, for a lengthy period of time, including for completing any community service and paying financial obligations. A sentence of probation with community service also serves societal interests in that there are a host of ways that Mr. Etter can give back to his community, as he has proven in the past and can prove once again.

## **CONCLUSION**

WHEREFORE, based on the foregoing, as well as in consideration of the attached letters in support, Mr. Etter respectfully prays that he be sentenced to a period of probation including community service as the court deems appropriate. Such a sentence adequately accounts for the seriousness of Mr. Etter's offense, promotes general and specific deterrence, as well as respect for the law, and avoids unwarranted disparities in sentencing.

                                       Respectfully Submitted,

                                       JEFFREY MICHAEL ETTER
                                       By Counsel

THE LAW OFFICE OF LANA MANITTA, PLLC

By:_____/s/_____.
Lana Manitta, VSB #42994
140B Purcellville Gateway Drive, #511
Purcellville, VA 20132
(703) 705-4428  FAX (703) 705-4429
Lmanitta@Manittalaw.com
Counsel for Jeffrey Etter

## CERTIFICATE OF ELECTRONIC FILING

      I HEREBY CERTIFY THAT on September 7, 2023, I filed the foregoing with the clerk of the court using the CM/ECF system which will forward an electronic copy to all counsel of record.

By: _____/s/_____.
Lana Manitta, VSB #42994
140B Purcellville Gateway Drive, #511
Purcellville, VA 20132
(703) 705-4428
FAX (703) 705-4429
Lmanitta@Manittalaw.com
Counsel for Mr. Etter